FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CHRISTIAN LOPEZ,

*Petitioner*,

v.

MERRICK B. GARLAND, Attorney General,

*Respondent*.

No. 23-870

Agency No.
A205-882-422

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted May 17, 2024
San Francisco, California

Filed September 11, 2024

Before: Sidney R. Thomas, Consuelo M. Callahan, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Sidney R. Thomas;
Partial Concurrence and Partial Dissent by Judge Gabriel P.
Sanchez

## SUMMARY[*]

### Immigration

Denying Christian Lopez's petition for review of a decision of the Board of Immigration Appeals, the panel concluded that: (1) Lopez's petit larceny convictions under Reno Municipal Code ("RMC") § 8.10.040 are crimes involving moral turpitude ("CIMTs") that made him removable; (2) the agency did not err in denying Lopez's asylum application as untimely; and (3) substantial evidence supported the denial of withholding of removal.

In *Matter of Diaz-Lizarraga*, 26 I. & N. Dec. 847 (BIA 2016), the BIA held that a theft offense constitutes a CIMT if it includes an intent to deprive either permanently or under circumstances where the owner's property rights are substantially eroded. The panel explained that its task, after the recent decision in *Loper Bright Enterprises v. Raimondo,* 144 S. Ct. 2244 (2024), is to evaluate a statute independently under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), giving "due respect," but not binding deference to the agency's interpretation.

The panel concluded that the BIA's decision in *Diaz-Lizarraga* was entitled to such respect, explaining that the decision is thorough and well-reasoned, consistent with the longstanding distinction between substantial and de minimis takings, and consistent with definitions of the Supreme Court and Model Penal Code.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Applying *Diaz-Lizarraga*, the panel concluded that RMC § 8.10.040 categorically defines a CIMT. Because the ordinance uses the term "deprive," but does not define it, the panel looked to the Model Penal Code and Nevada state law, which both define the term as a "withholding" that is either permanent or for so long that a substantial portion of its value to the owner is lost.

The panel rejected Lopez's argument that he was not removable because he could not obtain a pardon for petty municipal offenses. This argument was based on the "pardon waiver," 8 U.S.C. § 1227(a)(2)(A)(vi), which provides that a noncitizen cannot be removed for a CIMT after having received a full and unconditional pardon for the relevant conviction. Looking to the plain language of the statute, the panel concluded that the lack of availability of a pardon for a conviction does not render the conviction an improper basis for removal.

Lopez's ground of removability, 8 U.S.C. § 1227(a)(2)(A)(ii), requires convictions for two or more CIMTs "not arising out of a single scheme of criminal misconduct." The panel rejected Lopez's argument that his convictions arose from a "single scheme," relying on *Szonyi v. Whitaker*, 915 F.3d 1228 (9th Cir. 2019), where this court deferred to the BIA's interpretation that crimes are not part of a "single scheme" when each act constitutes a complete crime.

As to asylum, the panel rejected Lopez's arguments for why he should have been granted an exception to the one-year filing deadline due to "changed" or "extraordinary" circumstances based on his youth or ignorance of the law, or based on his disabilities.

Finally, the panel concluded that substantial evidence supported the denial of withholding of removal. As to past persecution, the record did not compel the conclusion that the abuse Lopez's mother suffered by his father while she was pregnant with Lopez was directed intentionally at him. The record supported the agency's conclusion that Lopez will not face future persecution in Mexico based on his identity as his mother's son.

Concurring in part and dissenting in part, Judge Sanchez joined in the majority's application of *Loper Bright* and its determination that *Diaz-Lizarraga* is entitled to *Skidmore* deference. However, he disagreed with the majority that Lopez's convictions are CIMTs. Observing that the ordinance does not define what an "intent to deprive" means, Judge Sanchez wrote that, by its plain terms, the ordinance is not limited to takings considered CIMTs under *Diaz-Lizarraga*. Further, he wrote that the majority erred by reaching for an interpretation not found in the text of the ordinance or any decision by a Nevada state court, and that the majority ignored that courts must construe statutory ambiguities in favor of the person facing removal. Judge Sanchez would grant Lopez's petition.

## COUNSEL

Kyle Edgerton (argued), Edgerton Legal LLC, Reno, Nevada, for Petitioner.

Spencer S. Shucard (argued), Trial Attorney; Keith I. McManus, Assistant Director; Office of Immigration Litigation; Brian M. Boynton, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

# OPINION

THOMAS, Circuit Judge:

Christian Lopez, a native and citizen of Mexico, seeks review of a decision by the Board of Immigration Appeals ("BIA") dismissing his appeal from a decision by an immigration judge ("IJ") finding him removable due to the commission of crimes involving moral turpitude ("CIMTs") and denying asylum and related relief. We deny the petition for review.

The BIA had jurisdiction to review the IJ's decision under 8 C.F.R. § 1003.1(b)(3). We have jurisdiction to review the BIA's final order of removal under 8 U.S.C. § 1252(b)(2).

We review legal questions, including questions of statutory interpretation, *de novo*. *Diaz-Quirazco v. Barr*, 931 F.3d 830, 838 (9th Cir. 2019). Prior to the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), we would determine whether the agency's interpretation was due deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See Diaz-Quirazco*, 931 F.3d at 838–39. However, after *Loper Bright Enterprises*, we may look to agency interpretations for guidance, but do not defer to the agency. 144 S. Ct. at 2266–67; *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (explaining that, while an agency's interpretation is "not controlling," it may still have "power to persuade" based on "the thoroughness evident in its consideration, the validity of its reasoning, [and] its consistency with earlier and later pronouncements"). We review factual findings, including those that underlie eligibility determinations for asylum and related relief, under

the substantial evidence standard.  *Rodriguez Tornes v. Garland*, 993 F.3d 743, 750 (9th Cir. 2021).

Where the BIA issues its own review of the evidence and law, our "review is limited to the BIA's decision, except to the extent the IJ's opinion is expressly adopted."  *Guerra v. Barr*, 974 F.3d 909, 911 (9th Cir. 2020)(internal quotation marks omitted).  The portions of the IJ decision that are "incorporated" by the BIA are treated as part of the BIA decision. *Maie v. Garland*, 7 F.4th 841, 845 (9th Cir. 2021).

I

Lopez was brought to the United States by his mother, Yadira, when Lopez was approximately two years old. Yadira left Mexico with her children due to domestic violence perpetrated by Lopez's father, Rodrigo.  According to Yadira, Rodrigo routinely inflicted serious physical violence on her that sometimes resulted in bleeding and loss of consciousness.  The violence was especially brutal during Yadira's pregnancy with Lopez, when Rodrigo "beat [her] in the stomach" and tried to choke her.  Yadira also testified that Rodrigo was violent towards their children.  When asked to speculate about Rodrigo's motive, Yadira testified that the violence seemed to "start out of nothing" and was likely exacerbated by drug use.  Yadira contacted the police at least once but reported that they did nothing to help.  Yadira testified that, after Lopez was born, Rodrigo "rejected" his son and expressed suspicions that Yadira had been unfaithful. Lopez required special assistance in school throughout his childhood.

Upon arriving in the United States in 2000, Yadira and Lopez lived for approximately thirteen years without lawful immigration status and did not file for asylum.  In 2013, one of Lopez's relatives received a T visa, which made Lopez

eligible for T-5 nonimmigrant status as a family beneficiary. However, in 2017, Lopez inadvertently allowed his T-5 status to expire. At that point, Lopez was 19 years old.

In July 2019, Lopez was arrested while driving a friend's borrowed car that had been reported as stolen. Once in custody, Lopez was charged with numerous offenses including trespassing, shoplifting, and carrying a concealed weapon without a permit. Lopez pleaded guilty in September 2021 to the felony weapons charge and four municipal charges of petit larceny under section 8.10.040 of the Reno Municipal Code ("RMC") in exchange for dismissal of the remaining charges. Records from Reno Municipal Court list the dates for Lopez's larceny offenses as May 14, May 17, May 21, and May 28, 2019. Lopez was sentenced to 12–30 months in Nevada prison for the weapons charge. After serving 14 months, Lopez was released from prison in January 2021 and placed directly in the custody of the Department of Homeland Security ("DHS").

On January 22, 2021, DHS initiated removal proceedings by serving Lopez with a notice to appear ("NTA") charging him as removable under Section 237 of the Immigration and Nationality Act ("INA"). The NTA lists, as the sole basis for removability, the fact that Lopez was "convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct." *See* 8 U.S.C. § 1227(a)(2)(A)(ii). The convictions referenced in the NTA are the four counts of petit larceny under RMC § 8.10.040.

Lopez argued before the IJ that his municipal charges did not provide a valid basis for removal for three reasons. First, he argued that RMC § 8.10.400 does not "categorically"

describe a CIMT because it does not include the requisite intent element.　Second, he argued that his larceny convictions arose from a "single scheme of criminal misconduct," and thus did not qualify as "two crimes" for the purpose of subsection 1227(a)(2)(A)(ii).　The IJ rejected these arguments in a written decision on March 30, 2021, and the BIA declined to consider Lopez's interlocutory appeal.　Lopez subsequently filed a motion presenting a third argument for terminating removal based on the unavailability of a pardon for his municipal offenses.

Concurrently, Lopez filed an application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT") in May 2021.　For asylum and withholding, Lopez claimed membership in four particular social groups ("PSGs"): (1) immediate relatives of Yadira, (2) "rejected children of Mexican men," (3) "recent Mexican deportees perceived as pochos," and (4) individuals with "actual and imputed anti-gang political opinion." Lopez argued that he suffered past persecution *in utero* based on Rodrigo's abuse of Yadira during her pregnancy. Lopez also asserted a fear of future persecution at the hands of his father, and from elements of Mexican society that are hostile to abandoned children, deportees from the United States, and individuals involved in anti-gang activism. Lopez's I-589 acknowledged that the application was filed more than one year after the lapse of his T status, but explained that he previously "had no access to legal advice" or information about the asylum process.　Lopez argued that he should be granted an exception to the ordinary deadline due to changed or exceptional circumstances.

On October 5, 2021, the IJ found Lopez removable under 8 U.S.C. § 1227(a)(2)(A)(ii) and denied Lopez's application for asylum, withholding, and relief under CAT.　The IJ

denied Lopez's asylum application as untimely, and rejected his argument that impending deportation constituted changed circumstances because doing so would allow him to "benefit from committing criminal acts."  The IJ denied Lopez's application for withholding of removal because Lopez failed to demonstrate a nexus between his fear of future harm and any protected ground.  The IJ addressed each of Lopez's claimed PSGs in turn.  First, the IJ addressed Lopez's argument that he was persecuted in utero by his father. The IJ concluded that his mother's testimony of domestic violence was credible, but that it did not constitute persecution against Lopez because he was not born, and Lopez did not demonstrate that his father had any intent to harm him specifically.  Next, the IJ rejected Lopez's claim based on paternal abandonment and his status as a recent deportee because neither constitutes a PSG with "the requisite social visibility."  Finally, the IJ rejected Lopez's claim based on his "potential anti-gang opinion" because "returning Mexicans . . . at risk of being targeted . . . by gangs" do not constitute a viable PSG.  The IJ also denied Lopez's application for CAT relief because there was no indication that anyone (including his father or uncle) had any interest in torturing him, or that such torture would happen "with the consent or acquiescence of a public official."

Lopez timely appealed to the BIA, and filed a brief challenging both the legal basis for removal and the IJ's denial of Lopez's application for asylum, withholding, and CAT relief.  On May 3, 2023, the BIA issued its decision affirming the IJ's decision on all counts and dismissing Lopez's appeal.  Reviewing the removability issue *de novo*, the BIA concluded that Lopez's municipal convictions involved CIMTs because the RMC should be construed in accordance with the Nevada state larceny statute, which

categorically defines larceny as a CIMT. *See Harvey v. State*, 375 P.2d 225, 226 (Nev. 1962). The BIA disposed of Lopez's other arguments about removability by citing applicable precedent decisions that it "decline[d] to revisit." *See Matter of Adetiba*, 20 I. & N. Dec. 506; *Matter of Nolan*, 19 I. & N. Dec. 539.

The BIA affirmed the IJ's determination that Lopez did not demonstrate circumstances warranting an exception to the asylum filing deadline. The BIA also affirmed the IJ's denial of withholding and CAT relief on the merits, holding that the IJ's factual findings were supported by substantial evidence. Lopez timely petitioned for review before this Court, challenging both the basis for removability and denial of his claim for asylum and withholding.

II

The BIA correctly concluded that Lopez is removable based on his municipal convictions for petty larceny. We review Lopez's three arguments contesting removability and conclude that each is foreclosed by the proper interpretation of the INA.

A

We begin by considering Lopez's argument that the ordinance under which he was convicted does not categorically define a CIMT because it does not specify whether the deprivation of property is permanent or temporary. We conclude that the BIA's most recent interpretation of the INA holding that a theft offense constitutes a CIMT if it includes an intent to deprive "either permanently *or* under circumstances where the owner's property rights are substantially eroded," *Matter of Diaz-Lizarraga*, 26 I. & N. Dec. 847, 854 (BIA 2016)(emphasis

added), is entitled to respect under *Skidmore*, 323 U.S. 134. Applying the BIA's interpretation, we conclude that a conviction under Reno's petit larceny ordinance, RMC § 8.10.040, is categorically a CIMT.

To determine whether an offense is a CIMT, we employ the "categorical approach" which focuses on the elements of the crime as stated in the relevant statute or ordinance rather than the specific conduct of the individual. *Pereida v. Wilkinson,* 592 U.S. 224, 233 (2021); *Barbosa v. Barr*, 926 F.3d 1053, 1057 (9th Cir. 2019). Under this approach, "we compare the elements of the state offense"—or in this case, municipal offense—"to the elements of the generic offense defined by federal law." *Almanza-Arenas v. Lynch*, 815 F.3d 469, 475 (2016) (en banc) (quoting *Lopez–Valencia v. Lynch*, 798 F.3d 863, 867–68 (9th Cir. 2015)). If the elements of the state or municipal crime are "the same as or narrower than" the elements of a generic CIMT, it is a "categorical match" and "every conviction qualifies as [a CIMT]." *Id*. If, by contrast, the state or local statute sweeps more broadly and criminalizes conduct that falls out the generic federal definition, a conviction does not qualify as a CIMT. *Maie*, 7 F.4th at 849.[1]

Prior to *Loper Bright Enterprises*, we would, under *Chevron*, defer to the BIA's specification of the "subset of theft offenses" that constitute CIMTs "when articulated by the BIA in a published opinion." *See Silva v. Garland*, 993 F.3d 705, 713 (9th Cir. 2021). Now, our task is to evaluate the statute independently under *Skidmore*, giving "due

---

[1] Neither the IJ nor the BIA relied on the modified categorical approach, so that is not at issue in this petition for review.

respect," but not binding deference to the agency's interpretation. *Loper Bright Enter.*, 144 S. Ct. at 2266–67.**[2]**

As the Supreme Court explained in *Skidmore*, agency decisions "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." 323 U.S. at 140. And "[t]he weight of such a judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id*. Under *Skidmore*, "[t]he deference given to an agency action may range from great respect to near indifference, depending on the degree of the agency's care, its consistency, formality, and relative expertness, and . . . the persuasiveness of the agency's position." *Bax v. Doctors Med. Ctr. of Modesto, Inc.*, 52 F.4th 858, 872 (9th Cir. 2022) (cleaned up). Thus, we have upheld BIA interpretations under *Skidmore* when the BIA "'confront[ed] an issue germane to the eventual resolution of the case' and 'resolve[d] it after reasoned consideration.'" *Alcarez-Rodriguez v. Garland*, 89 F.4th

---

[2] *Loper Bright Enterprises* also instructed that "when a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it." 144 S. Ct. at 2273. Here, we are mindful that the governing statute provides that "[t]he Secretary of Homeland Security shall be charged with the administration and enforcement of this chapter and . . . determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1). However, for the purposes of this case, we need not—and do not–determine whether this provision is a statute that expressly delegates interpretative authority to the agency.

754, 762 (9th Cir. 2023) (quoting *Route v. Garland*, 996 F.3d 968, 977 (9th Cir. 2021)).

With that guidance in mind, we examine the BIA's precedent decision in *Diaz-Lizarraga*, in the context our jurisprudence. In *Diaz-Lizarraga*, which involved a shoplifting offense, the BIA revised its prior interpretation of the distinction between theft CIMTs and non-turpitudinous temporary takings in light of the developments in state criminal law. 26 I. & N. Dec. at 851–52. The BIA explained that the purpose of the "traditional dichotomy of permanent versus temporary takings," was to separate morally "reprehensible conduct" from that conduct that reflects a less culpable mental state. *Diaz-Lizarraga*, 26 I. & N. Dec. at 849–51. Surveying contemporary state law in all fifty states, however, the BIA concluded that criminal law had since evolved to "recognize that many temporary takings are as culpable as permanent ones." *Id*. at 851. As such, the BIA decided to revise its interpretation to track the "mainstream, contemporary understanding of theft" reflected in the Model Penal Code. *Id*. at 852–54. Although *Diaz-Lizarraga* is inconsistent with "earlier . . . pronouncements," *Skidmore*, 323 U.S. 134, 140, the BIA carefully explained why the revised interpretation is nonetheless consistent with the agency's longstanding distinction—which we have also endorsed, *see Galeana-Mendoza v. Gonzales*, 465 F.3d 1054, 1058 (9th Cir. 2006)—between reprehensible and non-reprehensible criminal conduct, *Diaz-Lizarraga*, 26 I. & N. Dec. at 853–54.

The BIA's decision in *Diaz-Lizarraga* is thorough and well-reasoned. It is, as we shall explain, also consistent with judicial precedent. We have previously stated that "the generic definition of a crime involving moral turpitude is a

crime involving conduct that (1) is base, vile, or depraved and (2) violates accepted moral standards." *Navarro-Lopez v. Gonzales*, 503 F.3d 1063, 1068 (9th Cir. 2007) (en banc), *overruled on other grounds by United States v. Aguila-Montes de Oca*, 655 F.3d 915 (9th Cir. 2011). "Our understanding of the general meaning of this amorphous phrase does not vary materially from that of the BIA," which has defined morally turpitudinous conduct as that which is "inherently base, vile or depraved." *Galeana-Mendoza*, 465 F.3d at 1058 n.9 (quoting *In re Danesh*, 19 I. & N. Dec. 669, 670 (BIA 1988)). For theft offenses, we have consistently held that acts of theft, are "crime[s] of moral turpitude" regardless of "whether the theft be petty or grand." *United States v. Esparza-Ponce*, 193 F.3d 1133, 1136–37 (9th Cir. 1999). However, like the BIA, we have also recognized that convictions under certain "theft" statutes do not qualify as CIMTs because they sweep more broadly to criminalize "conduct involving [a] less culpable mens rea," *Maie*, 7 F.4th at 851, such as "joyriding," "receipt of stolen property," or "failure to make required disposition of funds," *see Castillo-Cruz v. Holder*, 581 F.3d 1154, 1161 (9th Cir. 2009); *see also Maie*, 7 F.4th at 849. *Diaz-Lizarraga* retains this core distinction, expressly affirming that it is still "appropriate to distinguish between substantial and de minimis takings when evaluating whether theft offenses involve moral turpitude." 26 I. & N. at 851.

The BIA's revised interpretation is also consistent with the generic definition of theft that has been adopted for other purposes by the Supreme Court and the Model Penal Code. For example, for the purpose of determining whether a theft offense is an "aggravated felony," 8 U.S.C. § 1227(a)(2)(A)(iii), the Supreme Court has endorsed a generic definition of theft as a "taking of property or an

exercise of control over property without consent with the criminal intent to deprive the owner of rights and benefits of ownership, *even if such deprivation is less than total or permanent.*" *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 184 (2007) (emphasis added) (quoting *Penuliar v. Gonzales*, 435 F.3d 961, 969 (9th Cir. 2006)).

Likewise, the Model Penal Code defines "theft by unlawful taking" to require an intent to "withhold property of another permanently or for so extended a period as to appropriate a major portion of its economic value . . . or to dispose of the property so as to make it unlikely that the owner will recover it." *See* Model Penal Code §§ 223.0 (defining "deprive"), 223.2 (defining "theft by unlawful taking or disposition). "[A]n offense's definition in the Model Penal Code can serve as an aid in determining the 'generic' meaning of the offense." *United States v. Rodriguez-Guzman*, 506 F.3d 738, 744 (9th Cir. 2007) (citing *Taylor v. United States*, 495 U.S. 575, 598 n.8 (1990)).

Given these considerations, we conclude that *Diaz-Lizarraga* is entitled to "*Skidmore* deference." *Orellana v. Barr*, 967 F.3d 927, 934 (9th Cir. 2020). Exercising our independent evaluation of the statute, we conclude that as applied to theft offenses, the statutory phrase "crimes involving moral turpitude," 8 U.S.C. § 1227(a)(2)(A)(ii), encompasses offenses that require the government to prove the defendant acted with an intent to permanently deprive an owner's property *or* substantially erode the owner's property rights. Offenses that criminalize less culpable conduct, including temporary takings with the intent return to the owner shortly thereafter, however, are still categorically overbroad.

In reaching this conclusion, we are mindful that *Diaz-Lizarraga* overruled long-standing BIA precedent that created a sharp distinction between permanent and temporary property deprivations and holding that an intent to deprive permanently was a necessary element of a CIMT. *See In re R–*, 2 I. & N. Dec. 819, 828 (B.I.A. 1947); *see also In re P–*, 2 I. & N. Dec. 887, 887 (B.I.A. 1947); *In re H–*, 2 I. & N. Dec. 864, 865 (B.I.A. 1947); *In re T–*, 2 I. & N. Dec. 22, 42 (Op. Att'y Gen. 1944).

We have historically endorsed this BIA's prior interpretation under *Chevron*. *See, e.g. Castillo-Cruz*, 581 F.3d at 1160. Applying the prior BIA permanent deprivation requirement, for example, we held that state theft statutes that are broad enough to "penalize[] temporary takings" do not categorically describe CIMTs. *Lozano-Arredondo v. Sessions*, 866 F.3d 1082, 1088 (9th Cir. 2017) (analyzing Idaho Code Ann. § 18-2403); *see also Garcia-Martinez v. Sessions*, 886 F.3d 1291, 1294 (9th Cir. 2018) (analyzing Or. Rev. Stat. Ann. § 164.015). We have not yet, however, had occasion to decide whether the BIA's revised interpretation in *Diaz-Lizarraga* reflects the correct interpretation of "moral turpitude" in the context of theft offenses, nor whether it was entitled to *Chevron* deference.[3] In light of the

---

[3] In cases addressing whether a theft offense constitutes a CIMT since 2016, we have declined to decide whether *Diaz-Lizarraga* reflects a lawful interpretation of the statute. *See Maie*, 7 F.4th at 847 ("[W]e do not review whether *Diaz-Lizarraga* was correctly decided"); *Silva*, 993 F.3d at 717 (holding that offense was a CIMT "regardless" of whether *Diaz-Lizarraga* applies); *Lozano-Arredondo*, 866 F.3d at 1087 n.3 (holding that Idaho's theft statute is overbroad even under the revised *Diaz-Lizarraga* definition); *Barbosa*, 926 F.3d at 1058 ("[T]he new [*Diaz-Lizarraga*] standard does not apply *retroactively* to [this] case.") (emphasis added); *Garcia-Martinez*, 886 F.3d at 1296 ("[T]he changed rule should not be applied [retroactively] in this situation.").

BIA's thoroughness, persuasive reasoning, and consistency with the longstanding distinction between substantial and de minimis takings, we conclude that the BIA's 2016 interpretation is correct.

With this revised definition of a CIMT in mind, we must decide whether Lopez's convictions meet that definition. *Garcia-Martinez*, 886 F.3d at 1293. The ordinance under which Lopez was convicted provides that:

> It is unlawful for any person to take or carry away the property of another with the intent to deprive the owner of his property therein in any value less than $650.00 and for his conviction therefore, he shall be fined in an amount not more than $1,000.00 and/or be incarcerated not more than six months. In addition to any other penalty, the court shall order the person to pay restitution.

RMC § 8.10.040.

The RMC does not define "deprive," but instructs that "[w]ords and phrases not specifically defined shall be construed according to the context and approved usage." RMC § 1.01.030(4). To ascertain the commonly accepted "usage" of the term, we consult both the Model Penal Code and Nevada state law, both of which define "deprive" as a "withholding" that is either permanent or for so long that a substantial portion of its value to the owner is lost. *See* Model Penal Code § 223.0; Nev. Rev. Stat. § 205.0824.

Reading the RMC § 8.10.040 with these definitions of "deprive" in mind, we conclude that the ordinance does not encompass de minimis temporary takings. Under *Diaz-*

*Lizarraga*, with which we agree, RMC § 8.10.040 categorically defines a CIMT. As such, Lopez's convictions under the ordinance provide a proper basis for removal under 8 U.S.C. § 1227(a)(2)(A)(ii) because RMC § 8.10.040 requires an intent to permanently deprive or substantially erode an owner's property interest.

B

We next address Lopez's argument that the INA's "pardon waiver" provision means he cannot be removed based on a CIMT conviction for which there is no available pardon. Interpreting the statute independently, we conclude that the BIA correctly concluded that the possibility of obtaining a pardon is not a prerequisite to removal under 8 U.S.C. § 1227(a)(2).

The pardon waiver is an exception to the statute providing that a noncitizen can be removed for committing a CIMT and provides that the statute "shall not apply in the case of an alien with respect to a criminal conviction if the alien subsequent to the criminal conviction has been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States." 8 U.S.C. § 1227(a)(2)(A)(vi). Lopez argues that his convictions are not a proper basis for removal under section 1227(a)(2)(A)(ii) because he is unable to obtain a pardon for a petty municipal offense. Because we have not previously addressed the meaning of pardon waiver in this context, we undertake the statutory analysis independently, giving proper respect but not controlling deference to the views of the BIA. *Loper Bright Enter.*, 144 S. Ct. at 2269–70.

To understand the applicability of the pardon waiver in this context, a brief review of the statutory history is instructive. Prior to 1917, there was no provision of the

immigration statutes that provided a deportation exception when the noncitizen had been pardoned. Jason A. Cade, *Deporting the Pardoned*, 46 U.C. Davis L. Rev. 355, 366 (Dec. 2012). However, various administrative opinions at the time supported a general understanding that a pardon removed immigration consequences of a crime. *Id.* The Immigration Act of 1917 provided for deportability for a CIMT, but also provided that deportation for committing a CIMT did not apply to noncitizens who had been pardoned. 39 Stat 874, 889–90. The Act also allowed for a presiding judge to make a Judicial Recommendation Against Deportation ("JRAD"). *Id.* This provision was "consistently...interpreted as giving the sentencing judge conclusive authority to decide whether a particular conviction should be disregarded as a basis for deportation." *Padilla v. Kentucky*, 559 U.S. 356, 362 (2010) (quoting *Janvier v. United States*, 793 F.2d 449, 452 (2nd Cir. 1986)). Congress narrowed the JRAD provision in the 1952 Immigration and Nationality Act, and then completely eliminated it in 1990. *Id.* at 363. The 1952 Act also changed the pardon waiver language which referenced only a "pardon" to require "a full and unconditional pardon" which was granted by the President or a Governor. Cade, *supra*, at 371.

The BIA has addressed the meaning of the pardon waiver in two decisions, the second of which overruled the first. In *Matter of Cevallos,* 12 I. & N. Dec. 750, 750 (BIA 1968*),* the BIA announced its own official interpretation that "[t]he conviction of an offense for which there is no pardoning authority . . . is not a conviction of a 'crime' within the meaning of [8 U.S.C. § 1227(a)(2)]." As in this case, *Cevallos* dealt with a municipal conviction for petty larceny. *Id*. at 750–51. Because "one convicted of a violation of a

municipal ordinance" in Florida could not "apply for and have an application for pardon considered," the BIA concluded a noncitizen could not be deported on the basis of those convictions. *Id*. at 751.

Twenty years later, the BIA overruled *Cevallos* in *Matter of Nolan*, 19 I. & N. Dec. 539 (BIA 1988). In *Nolan*, the respondent challenged his deportation based on an attempted burglary conviction for which he received an "automatic pardon" as a first-time felony offender under the Louisiana Constitution. *Id*. at 540–41; *see* La. Const. art. IV, § 5 (E)(1). The BIA concluded that, because the pardon was automatic, it was not "full and unconditional" as required by the statute. *Matter of Nolan*, 19 I. & N. Dec at 942-43. Further, the BIA held the fact that the respondent could not obtain a second pardon that would conform to the section 1227(a)(2)(A)(vi) was irrelevant. *Id*. at 545. "In our view, the availability or unavailability of a pardon under state or federal law, or the existence or nonexistence of a qualifying pardoning authority, has *no bearing* on . . . whether an offense constitutes a 'crime' for the purpose of deportability[.]" *Id*. (emphasis added). The BIA explained its decision to abandon *Cevallos* briefly, emphasizing two points. First, *Cevallos* had not subsequently been relied on by the BIA or "any court." *Id*. at 544. Second, *Cevallos* might perversely protect aggravated offenders whom a state intentionally "preclude[s]" from obtaining a pardon from deportation. *Id*. In the intervening thirty-six years, no federal court of appeals has addressed whether *Nolan*'s interpretation is reasonable with respect to pardon availability.

Against this background, and pursuant to *Loper Bright Enterprises*, 144 S. Ct. at 2273, we proceed to construe the statute independently. We begin, as always, with the plain language of the statute. *Cheneau v. Garland*, 997 F.3d 916,

920 (9th Cir. 2021) (en banc).  If the plain language is clear, our inquiry is complete.  *United States v. 475 Martin Lane*, 545 F.3d 1134, 1143 (9th Cir. 2008).

Here, the plain language of the statute provides only that relief is available when the petitioner "has been granted a full and unconditional pardon by the President of the United States or by the Governor of any of the several States."  The statute does not indicate that a pardon must be available.  If Congress had intended the pardon waiver to include crimes for which no pardon was available, it could easily have said so.  To add "or is otherwise unavailable" to the phrase "has been granted" would be to insert a different concept into the statute.  As the Supreme Court observed long ago, "[w]hen the language is plain, we have no right to insert words and phrases, so as to incorporate in the statute a new and distinct provision."  *United States v. Temple*, 105 U.S. 97, 99 (1881); *see United States v. Johnson*, 529 U.S. 53, 58 ("When Congress provides exceptions in a statute, it does not follow that courts have authority to create others. The proper inference . . . that Congress considered the issue of exceptions and, in the end, limited the statute to the ones set forth.")

Although there are no controlling precedential cases squarely on point, courts have strictly construed the pardon waiver.  The Supreme Court rejected the application of the provision to a pardon conditioned on good behavior, even though the pardon had been issued before the 1952 amendments altering the language of the pardon waiver. *Lehman v. United States*, 353 U.S. 685, 686-90 (1957). Although our sister circuits have not directly addressed the issue in this case, they have rejected attempts to expand the pardon waiver by implication.  For example, in *Wojciechowicz v. Garland*, 77 F.4th 511, 517 (7th Cir.

2023), the Seventh Circuit declined to expand the pardon waiver to include determinations of inadmissibility, as well as removals.  In *Tetteh v. Garland*, 995 F.3d 361, 366 (4th Cir. 2021), the Fourth Circuit declined to expand the pardon waiver beyond the enumerated grounds for removal.  In *Aristy-Rosa v. Attorney General*, 994 F.3d 112, 115 (3d Cir. 2021), the Third Circuit rejected an argument that Congress implied a pardon waiver for controlled substance offenses. In each of these cases, our sister Circuits founded their decisions on the plain text of the statute.

Here, construing the pardon waiver to prohibit deportation in circumstances where no pardon had been issued would fly in the face of the plain statutory terms, and would preclude removability for large categories of crimes for which the statute provided for removals.  Given the plain words of the statute, we not only agree with the BIA's application of *Matter of Nolan* to this case and afford it *Skidmore* deference, but also independently conclude, based on our own statutory analysis, that the pardon waiver does not require availability of a pardon to find a conviction to be a proper basis for removal.

Lopez relies on *Matter of Cevallos*, which the BIA has overruled, and two court cases:  *Gubbels v. Hoy*, 261 F.2d 952 (9th Cir. 1958) and *Costello v. INS*, 376 U.S. 120 (1964). Neither case is on point.  *Gubbels* involved the availability of a JRAD in court martial proceedings. 261 F.2d at 953. In *Gubbels*, we held that a noncitizen who was convicted by court-martial could not be deported based on those crimes because there was no way he could obtain a JRAD from the prosecuting entity.  *Id*. at 955-56.  That case did not involve the pardon waiver at issue here.  In *Costello v. INS*, the Supreme Court considered whether crimes committed by a naturalized citizen could later be used to deport the petitioner

after he was denaturalized. 376 U.S. at 121. The petitioner's argument was that he could be deported only for crimes committed while he was a noncitizen, and involved a semantic interpretation of a phrase not at issue in this case. *Id.* at 121-22. The case did not involve the pardon waiver or the construction of the statutory language we consider here.

In sum, we conclude that the plain language of the pardon waiver precludes Lopez's interpretation. The potential lack of availability of a pardon for a particular conviction does not render the conviction an improper basis for removal.[4]

C

Finally, we consider Lopez's argument that he cannot be deported based on his four larceny convictions because they arose from a "single scheme" of misconduct.

Pursuant to 8 U.S.C. § 1227(a)(2)(A)(ii), a non-citizen may be removed if he "at any time after admission is convicted of *two or more* crimes involving moral turpitude, *not arising out of a single scheme of criminal misconduct . . . .*" (emphasis added). Interpreting the phrase "single scheme," the BIA held that:

> [W]hen an alien has performed an act, which, in and of itself, constitutes a complete, individual, and distinct crime, he is deportable when he again commits such an

---

[4] Given our resolution of the issue, we need not —and do not—determine whether a pardon is actually available for Lopez's municipal convictions. We simply assume, *arguendo*, that no pardon is available for the crimes at issue. The Nevada Supreme Court has not decided that question, and we express no opinion on that issue.

> act, even though one may closely follow the other, be similar in character, and even be part of an overall plan of criminal misconduct.

*Matter of Adetiba*, 20 I. & N. Dec. 506, 509 (BIA 1992).

In *Szonyi v. Whitaker*, 915 F.3d 1228, 1232-35 (9th Cir. 2019), we endorsed *Adetiba* as a reasonable interpretation of the statute. Although we recognized in *Szonyi* that it was somewhat in tension with prior Ninth Circuit authority, including *Wood v. Hoy*, 266 F.2d 825 (9th Cir. 1959), *Szonyi* remains precedential authority which binds us. And, although *Szonyi* relied on *Chevron*, the Supreme Court has instructed that *Loper Bright Enterprises* does not "call into question prior cases that relied on the *Chevron* framework." 144 S. Ct. at 2273. And unlike the CIMT interpretation discussed in section II.a, the BIA has not promulgated a new interpretation of the statute to prompt us to reconsider our precedent.

Lopez argues that the petty larcenies that were committed on four separate occasions were part of a single crime spree and therefore exempt. This argument is precluded by *Szonyi* because Lopez was convicted of four "complete, individual, and distinct" criminal municipal charges of petit larceny notwithstanding the fact that they followed in quick succession and in response to similar material circumstances. *Szonyi*, 915 F.3d at 1232–33 (quoting *Adetiba*, 20 I. &. N. Dec. at 509). Pursuant to *Szonyi*, these crimes did not form "a single scheme of criminal misconduct" that would exempt him from deportation under 8 U.S.C. § 1227(a)(2)(A)(ii).

Lopez urges us to return to our pre-*Szonyi* jurisprudence. However, as a three-judge panel, we lack the authority to overrule existing circuit precedent absent "intervening higher authority" that is "clearly irreconcilable with" *Szonyi*. *Miller v. Gammie*, 335 F.3d 889, 893, 900 (9th Cir. 2003) (en banc). There is no such authority, so *Szonyi* binds us, and forecloses Lopez's argument.

## III

Having concluded that the BIA did not err in finding Lopez removable based on his municipal convictions, we turn to Lopez's application for asylum and withholding of removal.

## A

Although we lack jurisdiction to review the BIA's timeliness determination under 8 U.S.C. § 1158(a)(2)(B), we have jurisdiction to review the BIA's conclusion regarding the availability of equitable tolling due to "changed" or "extraordinary circumstances," where the facts are undisputed. *Alquijay v. Garland*, 40 F.4th 1099, 1102 (9th Cir. 2022); *Ramadan v. Gonzales*, 479 F.3d 646, 649–50 (9th Cir. 2007) (per curiam). The BIA's determination of whether undisputed facts constitute "changed" or "extraordinary circumstances" is a mixed question of fact and law, which we review *de novo*. *Ramadan*, 479 F.3d at 650. We conclude that the BIA did not err in denying Lopez's asylum application as untimely.

Lopez concedes that his application was filed well after the one-year deadline, but offers two arguments for why he should have been granted an exception due to "changed" or "extraordinary" circumstances. U.S.C. § 1158(a)(2)(D). First, Lopez argues that the consequences of his immigration

status did not become salient until he received the NTA following his convictions. But neither youth nor "ignorance of the legal requirement[s] [for asylum]" constitute extraordinary circumstances. *Alquijay*, 40 F.4th at 1103.

Second, Lopez argues that the BIA failed to "take seriously" his argument that he is entitled to an exception based on disability. Lopez raised this argument for the first time on appeal, citing both a learning disability that was diagnosed during childhood and mental illness that was diagnosed while he was in immigration detention. The only evidence proffered to the BIA was for the former and "pre-date[d] the [IJ's] decision by several years," which the BIA deemed not "material new evidence." Under these circumstances, the BIA "may apply a procedural default rule to arguments raised for the first time on appeal." *Honcharov v. Barr*, 924 F.3d 1293, 1296 (9th Cir. 2019) (per curiam). Without evidence of Lopez's recent diagnoses in the record, there is no undisputed factual basis to conclude that his mental illness constitutes "extraordinary circumstances." *See Toj-Culpatan v. Holder*, 612 F.3d 1088, 1090 (9th Cir. 2010) (assessing whether the record demonstrates "extraordinary circumstances").

## B

Substantial evidence supports the agency's denial of Lopez's application for withholding of removal based its conclusion that he did not demonstrate likelihood of persecution based on family membership.

As to past persecution, the agency concluded that the harm Lopez suffered "in utero" did not constitute past persecution because it was not motivated by animosity on account of his familial relationship with his mother. The record demonstrates that Yadira suffered serious domestic

abuse during her pregnancy that impacted Lopez physically, emotionally, and cognitively. The record does not, however, compel the conclusion that the abuse was directed intentionally at Lopez, who was not yet born at the time. In the agency's view, Lopez was an incidental victim of the abuse against his mother—not the direct target. The record does not compel reversal of this conclusion.

The record also supports the agency's conclusion that Lopez will not face future persecution based on his identity as Yadira's son. Lopez did not provide any evidence that Lopez's father or paternal relatives have any interest in harming him as an adult. To the contrary, the record shows that Rodrigo has been absent from his children's lives. Accordingly, the record does not compel the conclusion that Lopez will face persecution at the hands of his father if he his returns to Mexico.

IV

In sum, Lopez's larceny convictions constitute CIMTs that render him properly removable. His asylum application was untimely, and no circumstances permit excusing the untimeliness. Substantial evidence supports the agency's denial of withholding of removal. We deny the petition for review. Lopez's motion to stay removal is denied as moot.

**PETITION DENIED.**

SANCHEZ, Circuit Judge, concurring in part and dissenting in part:

Petitioner Christian Lopez, a native and citizen of Mexico, was convicted of four counts of petit larceny under section 8.10.040 of the Reno Municipal Code (RMC).  The majority denies Lopez's petition for review, finding that his petit larceny convictions categorically qualify as crimes involving moral turpitude (CIMT).  In reaching this conclusion, the majority first determines that the BIA's decision in *Matter of Diaz-Lizarraga*, 26 I. & N. Dec. 847 (BIA 2016), is entitled to deference under *Skidmore v. Swift & Co.,* 323 U.S. 134 (1944), and was correctly decided.  Next, the majority concludes that Lopez's petit larceny convictions are CIMTs because the "intent to deprive" under RMC § 8.10.040 may be interpreted according to "commonly accepted usage" that implicitly incorporates the Model Penal Code and Nevada state law.

I agree with the majority's application of *Loper Bright Enterprises v. Raimondo,* 144 S. Ct. 2244, 2262 (2024), which requires courts to "exercise independent judgment in determining" the meaning of statutory terms such as crimes of moral turpitude, but allows us to afford *Skidmore* deference to thorough and well-reasoned agency interpretations.  However, even if *Diaz-Lizarraga* correctly determined that theft offenses involving the intent to deprive "either permanently or under circumstances where the owner's property rights are substantially eroded" are CIMTs, *see* 26 I. & N. Dec. at 853, Lopez's petty larceny convictions are not a categorical match.

Reno defines petty larceny as taking or carrying away the property of another valued under $650 "with the intent to deprive the owner of his property therein," RMC § 8.10.040.

The ordinance, however, does not define what an "intent to deprive" means.  By its plain terms, the ordinance is not limited to permanent deprivations of property or to temporary deprivations that "substantially erode" the value of the owner's property.  The majority errs by reaching for an interpretation not found in the text of the ordinance or any decision by a Nevada state court.  In filling in this gap, the majority ignores that we must construe statutory ambiguities in favor of the person facing removal.  *See Moncrieffe v. Holder*, 569 U.S. 184, 205 (2013).  Because Lopez's convictions are not categorically crimes involving moral turpitude, I would grant the petition and remand.

## I.

I begin by narrowing my disagreement with the majority. I agree that the BIA did not err in denying Lopez's petition for asylum as untimely and that substantial evidence supports the agency's denial of his claim for withholding of removal.  I agree in the majority's analysis of the "pardon waiver," and that Lopez's four larceny offenses do not constitute a single scheme under applicable precedents. Finally, I join in the majority's application of *Loper Bright* and its determination that *Diaz-Lizarraga* is entitled to *Skidmore* deference.  As the majority explains, in exercising our independent review of statutes, we may "seek aid from the interpretations of those responsible for implementing particular statutes" under *Skidmore*.  *Loper Bright Enter.*, 144 S. Ct. at 2262.  However, the weight we afford the agency's judgment will "depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Id*. at 2259 (quoting *Skidmore*, 323 U.S. at 140).  While *Diaz-Lizarraga* is entitled to *Skidmore*

deference, the majority errs in concluding that Lopez's petit larceny convictions categorically constituted crimes of moral turpitude under the BIA's revised theft definition.

## II.

We employ a two-step framework for determining whether an offense is categorically a crime of moral turpitude. *Rivera v. Lynch*, 816 F.3d 1064, 1070 (9th Cir. 2016). First, we identify the elements of the statute. *Coquico v. Lynch*, 789 F.3d 1049, 1051 (9th Cir. 2015). Second, we "compare the elements of the statute of conviction to the generic definition of a [CIMT] and decide whether the conviction meets that definition." *Betansos v. Barr*, 928 F.3d 1133, 1137 (9th Cir. 2019) (internal quotation marks omitted). A conviction constitutes a CIMT only "if the full range of conduct encompassed by the statute, including the least egregious conduct prosecuted under the statute, is a crime of moral turpitude." *Barragan-Lopez v. Mukasey*, 508 F.3d 899, 903 (9th Cir. 2007) (internal quotation marks omitted). We may only find a categorical match when there is no "'realistic probability' that the statute of conviction would be applied to non-turpitudinous conduct." *Fugow v. Barr*, 943 F.3d 456, 458 (9th Cir. 2019) (quoting *Gonzales v. Duenas-Alvarez*, 549 U.S. 183, 193 (2007)).

"Although the immigration statutes do not specifically define offenses constituting crimes involving moral turpitude, a crime involving moral turpitude is generally a crime that (1) is vile, base, or depraved and (2) violates accepted moral standards." *Hernandez-Gonzalez v. Holder*, 778 F.3d 793, 801 (9th Cir. 2015) (internal quotation marks omitted). "To be considered a crime of moral turpitude, a crime other than fraud must be more than serious; it must

offend the most fundamental moral values of society, or as some would say, shock the public conscience." *Id.* (cleaned up). We have recognized that "at some level all illegal acts violate societal norms and values—that is why the acts are illegal. However, 'crimes involving moral turpitude' is a limited category of crimes and does not extend to cover all conduct that violates the law." *Navarro-Lopez v. Gonzales,* 503 F.3d 1063, 1073 n.9 (9th Cir. 2007)*,* overruled in part by *United States v. Aguila-Montes de Oca*, 655 F.3d 915 (9th Cir. 2011).

Until recently, the BIA had long determined that "a theft offense is not categorically a crime of moral turpitude if the statute of conviction is broad enough to criminalize a taking with intent to deprive the owner of his property only temporarily." *Almanza-Arenas v. Lynch*, 815 F.3d 469, 476 (9th Cir. 2016) (en banc). For years, we agreed that the distinction between permanent and temporary deprivations of property was appropriate because it reflected differing degrees of culpability. *Id.*; *see Castillo-Cruz v. Holder*, 581 F.3d 1154, 1160 (9th Cir. 2009) ("A recipient who intends. . . to deprive its rightful owner of its possession only temporarily would not seem to have committed an act that may be termed morally turpitudinous.").

In 2016, in a "rather abrupt change in the law," the BIA broadened the definition of theft offenses that qualify as CIMTs in *Diaz-Lizarraga*. *See Garcia-Martinez v. Sessions*, 886 F.3d 1291, 1295 (9th Cir. 2018). The BIA concluded in its precedential decision that "a theft offense is a crime involving moral turpitude if it involves an intent to deprive the owner of his property either permanently or under circumstances where the owner's property rights are substantially eroded." *Diaz-Lizarraga*, 26 I. & N. Dec. at 853. This revised interpretation borrows from section

223.0(1) of the Model Penal Code (defining the term "deprive") and reflects developments in the law of a majority of states. *See id.* at 851–52. Notably, however, the BIA observed that "[w]e continue to believe that it is appropriate to distinguish between substantial and de minimis takings when evaluating whether theft offenses involve moral turpitude." *Id.* at 851. Thus, where a statute "does not require the government to prove the defendant intended to permanently deprive or substantially erode the owner's property rights," it is not a crime involving moral turpitude. *See Maie v. Garland*, 7 F.4th 841, 849–851 (9th Cir. 2021); *see also Diaz-Lizarraga*, 26 I. & N. Dec. at 853–54; *Castillo-Cruz*, 581 F.3d at 1161.

RMC § 8.10.040 does not define the scope of conduct criminalized under the ordinance. Petty larceny is defined as follows:

> It is unlawful for any person to take or carry away the property of another with the intent to deprive the owner of his property therein, in any value less than $650.00 and for his conviction therefore, he shall be fined in an amount not more than $1,000.00 and/or be incarcerated not more than six months. In addition to any other penalty, the court shall order the person to pay restitution.

RMC § 8.10.040.[1] The ordinance does not provide a definition for the term "deprive." *See* RMC § 1.01.020 (definitions). Nor has any Nevada state court offered

---

[1] In 2020, after Lopez was convicted, RMC § 8.10.040 was updated to include property up to $1,200. *See* Ord. No. 6569, § 1, 8-12-20.

guidance as to the scope of RMC § 8.10.040. The only state court decision to reference the ordinance involved a defendant convicted for shoplifting a candy bar and cough drops from a store. *See In re Coughlin*, 128 Nev. 905, 381 P.3d 623 (2012). Thus, the RMC's "greater breadth is evident from its text." *See United States v. Bautista*, 989 F.3d 698, 705 (9th Cir. 2021) (internal quotation marks omitted). In the absence of any limiting language, the ordinance may well reach temporary de minimus takings, crimes that do not involve morally turpitudinous conduct. *See Diaz-Lizarraga*, 26 I. & N. Dec. at 851. Indeed, the government concedes that standing alone, the text of RMC § 8.10.040 could not constitute a CIMT.

To compensate for this gap, the majority relies on the instruction in the RMC that "[w]ords and phrases not specifically defined shall be construed according to the context and approved usage of the language." RMC § 1.01.030(4). The majority then concludes that common usage of the term "deprive" permits us to consult the Model Penal Code and Nevada state law, both of which define "deprive" as "withhold[ing]" a property interest either permanently or for so long that a substantial portion of its value is lost. *See* Model Penal Code 223.0(1); NRS § 205.0824.

The majority's approach is out of step with the Supreme Court's admonition that we must construe ambiguities— such as the absence of explicit statutory reference or consistent state court interpretation—in favor of the noncitizen. *See Moncrieffe,* 569 U.S. at 205. In *Moncrieffe*, the Supreme Court held that possession of marijuana with intent to distribute under state law was not a categorical aggravated felony barring a grant of discretionary relief from removal. *Id*. at 187. Under the categorical approach, which

requires starting from the presumption "that the conviction rested upon [nothing] more than the least of th[e] acts criminalized," we must "err on the side of underinclusiveness because ambiguity in criminal statutes referenced by the INA must be construed in the noncitizen's favor." *Id.* at 190–91, 205. The Court held that the petitioner's conviction was not a CIMT because it could be categorized either as a felony or a misdemeanor, and "[a]mbiguity on this point means that the conviction did not 'necessarily' involve facts that correspond to an offense punishable" as a felony under the Controlled Substances Act. *Id*. at 194–95.

Here, the government concedes the text of RMC § 8.10.040 is ambiguous as to the breadth of theft it criminalizes. However, in drawing a series of inferences to find a categorical match, the majority fails to construe ambiguities in favor of the non-citizen as required under *Moncrieffe*. *Id*. at 205.

Compounding its mistake, the majority does not point to any evidence suggesting that the RMC intended to incorporate the definition of "deprive" from Nevada state law or the Model Penal Code. As a threshold matter, the RMC forecloses any legal reliance on the NRS, stating that state law references contained therein "are not intended to have any legal effect but are merely intended to assist the user of [the RMC]." RMC § 1.01.060. Thus, the RMC's cross-reference to NRS § 204.240 cannot be construed as an "approved usage" to supply meaning to the RMC's undefined terms.

Indeed, the Nevada legislature contemplates that state and local authorities can criminalize conduct in different ways. *See* NRS §§ 266.105, 268.0035(1)(c) (vesting cities

with "all . . . powers necessary or proper to address matters of local concern for the effective operation of city government[.]").  Reno routinely criminalizes conduct that state law does not.  *See, e.g.,* RMC § 8.04.020 (criminalizing inflating "toy balloons with hydrogen"); RMC § 8.04.030 (criminalizing "marathon dancing or marathon walking contest" in the city).  Reno also criminalizes other petty theft offenses that sweep more broadly than crimes of moral turpitude as defined by *Diaz-Lizarraga*.  For example, RMC §§ 8.10.050(d)(3)–(4) criminalizes the unauthorized removal of a shopping cart with the intent to deprive the owner either "temporarily or permanently."  There is no basis to infer that RMC § 8.10.040 is limited to an intent to permanently deprive or substantially erode an owner's property rights when other municipal petty theft offenses do not impose this constraint.

Nor is the majority's reliance on what constitutes a generic theft offense under the Model Penal Code appropriate.  In *Diaz-Lizarraga*, the BIA found that shoplifting under Arizona state law was a CIMT even though it did not specify the duration of "intent to deprive" in part because Arizona had "adopted the Model Penal Code's definition of the term 'deprive' more or less verbatim." 26 I. & N. Dec. at 847–48, 851–52.  Here, neither party has proffered any authority for the proposition that Reno follows the Model Penal Code.  *See Maie,* 7 F.4th at 851.

In short, there is a "realistic probability" that one could be convicted under RMC § 8.10.040 for both a categorical deprivation *and* conduct that is not morally turpitudinous.  *See Moncrieffe*, 569 U.S. at 191; *see also Rivera*, 816 F.3d at 1077.  Without evidence to the contrary, we may not fill in the gaps with our own inferences about what conduct is criminalized under RMC § 8.10.040.  *See Leocal v. Ashcroft*,

543 U.S. 1, 11 n.8 (2004) ("Even if [18 U.S.C. § 16, defining a crime of violence under the INA] lacked clarity on this point, we would be constrained to interpret any ambiguity in the statute in petitioner's favor.").  Because the government has not demonstrated by statutory text or state court precedent that RMC § 8.10.040 categorically describes a crime of moral turpitude, I would grant Lopez's petition.