**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| OFIR HANAN; MELANIE GILLUM, | No. 24-6193 |
| *Plaintiffs - Appellants*, | D.C. No. 4:23-cv-02414-HSG |
| v. | |
| UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES; MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security; JOSEPH B. EDLOW, Director, U.S. Citizenship and Immigration Services; RICHARD VALEIKA, San Francisco Field Office Director, U.S. Citizenship and Immigration Services; TODD BLANCHE, Acting Attorney General; BOARD OF IMMIGRATION APPEALS, | OPINION |
| *Defendants - Appellees*. | |

Appeal from the United States District Court
for the Northern District of California
Haywood S. Gilliam, Jr., District Judge, Presiding

Argued and Submitted February 10, 2026
San Francisco, California

Filed April 27, 2026

Before: N. Randy Smith, Jacqueline H. Nguyen, and
Gabriel P. Sanchez, Circuit Judges.

Opinion by Judge Nguyen

**SUMMARY**[*]

**Immigration**

The panel affirmed the district court's grant of summary judgment to the government in an action in which Ofir Hanan, a citizen of Israel, and Melanie Gillum, his U.S. citizen wife, challenged the denial by U.S. Citizenship and Immigration Services ("USCIS") of Gillum's petition for Hanan to be classified as an immediate relative.

Hanan, who had entered the United States on a tourist visa and overstayed, married Gillum in 2014. Based on the marriage, Gillum petitioned for Hanan's immediate relative classification by filing an I-130 petition, which is a precursor to permanent residence. USCIS concluded that Hanan's prior marriage to a different U.S. citizen was a sham, entered into for the sole purpose of obtaining benefits. USCIS thus denied Gillum's I-130 petition under the marriage fraud bar,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

which precludes approval of an I-130 petition if the alien had previously "attempted . . . to enter into a marriage for the purpose of evading the immigration laws." 8 U.S.C. § 1154(c)(2). After the Board of Immigration Appeals dismissed Gillum's appeal of the denial of the petition, Gillum and Hanan (together, "plaintiffs") sought review of the agency's decision in the district court, claiming violations of the Administrative Procedure Act and procedural due process.

Plaintiffs contended that the marriage fraud bar in 8 U.S.C. § 1154(c) did not apply to Hanan's first marriage because no one sought any immigration benefit for him based on that marriage. The panel held, based on the statute's plain meaning, that the marriage fraud bar does not require that the noncitizen apply for an immigration benefit. Rather, under the statute's unambiguous meaning, if a noncitizen attempts or conspires "to enter into a marriage for the purpose of evading the immigration laws," then the marriage fraud bar applies. Whether the noncitizen takes any further actions, such as marrying and filing for immigration benefits, is immaterial.

Plaintiffs alternatively contended that USCIS violated their procedural due process rights by relying on Hanan's ex-wife's statement without making her available for cross-examination. To determine whether the procedures provided to protect a liberty or property interest were constitutionally sufficient, the panel balanced the three factors set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976): 1) the private interest affected by the official action; 2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value of additional or substitute procedural safeguards; and 3) the

government's interest, including the burdens that additional or substitute procedural requirements would entail.

The panel clarified the exact liberty or property interest at issue by explaining that this court held, in *Ching v. Mayorkas*, 725 F.3d 1149 (9th Cir. 2013), that a U.S. citizen who meets the I-130 criteria has a protected property interest in the petition's approval because § 1154(b)'s mandatory language makes the agency's decision nondiscretionary.

Next, weighing the three *Mathews* factors, the panel concluded that plaintiffs received adequate process. While their property interest in having USCIS reach a correct decision on Gillum's I-130 petition was substantial, requiring cross-examination of the ex-wife would not materially advance that interest and would impose unnecessary burdens on the agency.

Lastly, the panel concluded that substantial evidence supported the agency's decision to apply the marriage fraud bar, noting the ex-wife's sworn statement that she made a "deal" to marry Hanan in exchange for payments, Hanan's admission to state investigators that he paid her to marry him "in order to get a green card," and the fact that plaintiffs' own evidence offered very little support to their claim that the prior marriage was bona fide.

**COUNSEL**

Stacy Tolchin (argued) and Megan A. Brewer, Law Offices of Stacy Tolchin, Pasadena, California, for Plaintiffs-Appellants.

Kelsey J. Helland (argued) and Elizabeth D. Kurlan, Assistant United States Attorneys; Pamela T. Johann, Chief, Civil Division; Patrick D. Robbins, Acting United States Attorney; Office of the United States Attorney, United States Department of Justice, San Francisco, California; for Defendants-Appellees.

**OPINION**

NGUYEN, Circuit Judge:

Ofir Hanan, a native and citizen of Israel, and Melanie Gillum, his U.S. citizen wife, have a bona fide marriage. But U.S. Citizenship and Immigration Services ("USCIS") denied Gillum's petition for Hanan to be classified as an immediate relative, the precursor to permanent residence. USCIS determined that Hanan's prior marriage was a sham, entered into for the sole purpose of obtaining immigration benefits. Gillum and Hanan sued, arguing that the marriage fraud bar does not apply because, regardless of Hanan's intent, neither he nor his first wife ever sought any immigration benefits based on that previous marriage. The district court granted summary judgment in favor of the government.

We affirm. Hanan's conduct fits squarely within the plain statutory language of the marriage fraud bar because he previously "attempted . . . to enter into a marriage for the

purpose of evading the immigration laws." 8 U.S.C. § 1154(c)(2). We also reject Hanan's remaining arguments. Hanan received all the process he was due, and substantial evidence supports the agency's fraud finding. The district court therefore properly granted summary judgment for the government.

## I.

Hanan entered the United States on a tourist visa in April 2008 and stayed after his visa expired. In May 2010, he married Margarita Jaimes, his first wife. They divorced less than two years later. Although Jaimes is a U.S. citizen, neither she nor anyone else ever filed for an immigration benefit for Hanan based on that marriage.

In January 2014, Hanan married Gillum, his present wife with whom he has a U.S.-citizen child. Gillum petitioned for Hanan's immediate relative classification by filing form I-130 with USCIS, and Hanan applied to adjust his status to permanent resident. In March 2017, Gillum and Hanan appeared with their counsel for an interview by an immigration services officer. The officer read them a sworn statement from Hanan's first wife, Jaimes, that the "whole purpose" of her marriage with Hanan "was for him to get his papers and for [her] to get extra cash":

> I . . . was working at Little [Caesars] when I was in high school. There I was approached by a guy named "Mike"[;] he asked me how much money I was making there and I said enough. We became friends and one day he asked me if I wanted to marry his cousin Ofir Hanan for some extra cash. I took the deal. I don't remember who but the day we got

> married in the Van Nuys area I got about
> [$]1500–2000 in cash.  We agreed on $500 a
> month and I sometimes asked for more.  In
> months he asked me to move to San
> Francisco and I said no that I didn't want[] to
> move and I didn't want to help him anymore.
> We filed for divorce and never spoke[] again.
> I was paid about [$]7,500–8,000 because
> sometimes I would ask for more.  I was paid
> about 9 months.   We have never lived
> together.

Hanan, Gillum, and their counsel were given access to a private room for 20 minutes where they prepared Hanan's handwritten affidavit to rebut Jaimes's allegations.

Hanan stated that he met Jaimes "through friends" when he was 23 and she 19 and that they "spent some time together."  Hanan "was attracted" to Jaimes and "excited to be in a relationship with her."  They "married at a church in Van Nuys" with their "good friends" in attendance.  Hanan asked to have the cross taken down because he is Jewish. Sometime later, Hanan's father met Jaimes at Hanan's apartment in Tarzana, California.  When Jaimes and Hanan "went to Las Vegas," she met his aunt and uncle.

Hanan disputed the accuracy of Jaimes's account generally and specifically denied having a cousin named "Mike."  He repeatedly claimed that Jaimes was "unstable" and "abused alcohol."  In Las Vegas, he conceded, "she was on good behavior" with his aunt and uncle, but he described that trip as "particularly difficult because [she] was drinking a lot."  Hanan "asked her to move to San Francisco" with him because he "intended to build [his] future with her," and her refusal "caused further problems" in their "unstable

relationship." After "a few months" of marriage, Hanan and Jaimes separated, and he filed for divorce.

Hanan acknowledged that he and Jaimes discussed "the process of petitioning for the non-U.S.-citizen" but claimed that it was not his "sole reason" for their marriage. He asserted that Jaimes "demanded money" from him, which he "gave her . . . at times," but he denied paying her to marry him. He speculated that Jaimes had provided an inaccurate account because she was "angry about the divorce" and his refusal to meet her demands for money.

In June 2017, USCIS sent Gillum a written notice of intent to deny her I-130 petition based on the marriage fraud bar, 8 U.S.C. § 1154(c). The agency found that Jaimes's statement constituted substantial and probative evidence of "[a]n attempt by [Hanan] to enter into a marriage for the purpose of evading the immigration laws," *see id.* § 1154(c)(2), and "[Hanan's] seeking to be accorded immediate relative status as the spouse of a U.S. citizen for the purpose of evading the immigration laws," *see id.* § 1154(c)(1).[1]

The agency found Hanan's rebuttal "unpersuasive" because it was a "generalized account of how [the] marriage failed" from alcohol abuse, and Hanan "did not rebut any of the specific allegations made by [Jaimes]" other than to deny having a cousin named "Mike." However, the agency provided Gillum "an opportunity to respond in writing" within 30 days before it would deny her petition.

---

[1] The agency appears to have dropped its reliance on § 1154(c)(1) and does not currently dispute that Hanan and Gillum have a bona fide marriage.

In their written response, Gillum and Hanan provided photos that purportedly showed Jaimes and Hanan's wedding and Jaimes meeting Hanan's father and sister at Christmastime. In addition, they provided declarations that discussed Hanan's father visiting Jaimes and Hanan in Los Angeles a few months after the marriage, Hanan's uncle seeing them in Las Vegas on their honeymoon, and an acquaintance attending their wedding. Lastly, Gillum and Hanan argued that (1) the marriage fraud bar does not apply because no one sought an immigration benefit based on Hanan and Jaimes's marriage; (2) they did not receive due process; and (3) the evidence does not support a finding of marriage fraud.

In July 2020, USCIS sent Gillum a second notice of intent to deny. The agency gave "little weight" to the declarations because "none . . . mention any detailed, ongoing interaction with [Jaimes and Hanan] in the course of their married life." Hanan's father, uncle, and acquaintance all generally opined that he and Jaimes would start a life together but otherwise provided no specifics. The agency also cited Gillum and Hanan's failure to submit evidence of joint property, a shared residence, or commingling of financial resources.

USCIS further relied on a California Department of Justice report summarizing an interview of Hanan in connection with an investigation into illegal slot machine distribution. The notice contained a redacted excerpt of the report:

> When HANAN returned to the Bay Area he stopped working with the slot machines. HANAN said he spent a few months doing fire extinguisher repairs but wasn't making

any money. Soon after ▮▮▮▮▮ told him, "We can help you stay here, like legally, but we need you back here in San Francisco." ▮▮▮▮▮ told HANAN that he would arrange for him to marry a U.S. citizen in order to get a green card. HANAN said that on May 15, 2010, he was married to Margarita JAMES [sic] in Van Nuys. HANAN said that ▮▮▮▮▮ is the one who found JAMES and that he paid her to marry him. HANAN did not know JAMES' birth date but said she was 20-years old. He provided the following telephone number for JAMES: ▮▮▮▮▮. HANAN said he was told to pay JAMES $250.00 every month until he received his green card. HANAN would deposit money directly in JAMES' bank account. HANAN said that ▮▮▮▮▮ sent him to an immigration attorney by the name of "George" who helped him with his paperwork. HANAN said that "George" was the same person that helped ▮▮▮▮▮ with his arranged marriage ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. HANAN told me that he recently filed for divorce from JAMES.

USCIS allowed Gillum to file a written response within 90 days.

In their response, Gillum and Hanan argued that their right to confront evidence had been "repeatedly violated" and that the evidence did not support a finding of marriage fraud. They demanded that USCIS "produce the full law enforcement statement and proof of payments it is relying on

and provide an extension of time to respond to the new, complete evidence."

In February 2021, USCIS sent Gillum a third notice of intent to deny with a copy of the entire redacted state investigative report.  The agency explained that because Hanan's admission to the state investigators "was against his own interests," was "memorialized by a third party with no interest in the outcome of [the immigration] proceedings," and "corroborated . . . Jaimes' admission," it had been accorded "full weight."  The agency declined to provide evidence of payments, asserting that it did "not need to prove each element or fact of the purported fraud scheme."  The letter stated that Gillum could "submit additional information, evidence or arguments to support the petition" within 30 days.  In response, Gillum and Hanan largely repeated their prior arguments but also asserted that the report denied them a meaningful opportunity to confront adverse evidence because it did not disclose the names of the interviewing officer and the other officers and individuals involved.

In March 2022, USCIS finally denied Gillum's petition for an immediate relative classification on the ground that she and Hanan failed to rebut the evidence that Hanan's first marriage was fraudulent.  Concurrently, USCIS denied Hanan's application to adjust status on the ground that he had not shown entitlement to an immediately available immigrant visa.  The BIA dismissed Gillum's appeal of the denial of her I-130 petition.

Gillum and Hanan sought review of the agency's decision in the district court, claiming violations of the Administrative Procedure Act ("APA") and procedural due process.  Both parties moved for summary judgment, and the

district court granted summary judgment in favor of the government.

We have jurisdiction under 28 U.S.C. § 1291. We review the BIA's decision to impose the marriage fraud bar under the APA and will set the decision aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Zerezghi v. USCIS*, 955 F.3d 802, 807 (9th Cir. 2020) (quoting 5 U.S.C. § 706(2)(A)). Legal questions, such as statutory interpretation, and mixed questions of law and fact, such as whether the agency denied plaintiffs procedural due process in adjudicating Gillum's I-130 petition, are reviewed de novo. *See id.*; *Lopez v. Garland*, 116 F.4th 1032, 1036 (9th Cir. 2024). We review the agency's factual findings for substantial evidence. *See Zerezghi*, 955 F.3d at 814.

## II.

We begin with the threshold legal question. Plaintiffs contend that the marriage fraud bar in 8 U.S.C. § 1154(c) does not apply to Hanan's first marriage because no one sought any immigration benefit for him based on that marriage.

## A.

The marriage fraud bar concerns petitions for classification as an immigrant based on a qualifying relationship to a U.S. citizen or lawful permanent resident. *See* 8 U.S.C. § 1154(a). There are two classifications at issue. The first, "immediate relative" status, is available to "the children, spouses, and parents" of U.S. citizens. *Id.* § 1151(b)(2)(A)(i); *see id.* § 1154(a)(1)(A)(i). The second, "preference" status, is available based on the immigrant's employment or family members in the United States,

*see id.* § 1153(a)–(b), including "spouses or children of an alien lawfully admitted for permanent residence,"[2] *id.* § 1153(a)(2)(A); *see id.* § 1154(a)(1)(B)(i)(I).

The U.S. citizen or permanent resident initiates the classification process by filing form I-130, a petition for alien relative. *See* 8 C.F.R. § 204.1(a)(1). If USCIS verifies the relationship and approves the petition, *see* 8 U.S.C. § 1154(b), then the noncitizen, if already in the United States, can apply to USCIS for adjustment of status to permanent resident, *see id.* § 1255(a)(1), or, if not, to a Department of State consular office for an immigrant visa,[3] *see id.* § 1201. Admission to the United States on an immigrant visa accords permanent resident status. *See Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 46 (2014).

However, if USCIS determines that the noncitizen has previously committed immigration-related marriage fraud, then § 1154(c) bars the agency from granting the immigrant classification petition. This is a mandatory, lifetime bar, and it applies even if the petition is based on a bona fide marriage or other qualifying relationship. *See Zerezghi*, 955 F.3d at 804–05; Oseguera, 17 I. & N. Dec. 386, 387 (B.I.A. 1980) ("[Section 1154(c)] bar[s] approval not only of new 'spouse'

---

[2] Because the statutory and regulatory provisions at issue use the term "alien," to avoid confusion we also use that term to mean a person who is "not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). We use the term "noncitizen" interchangeably.

[3] Adjustments and visas based on employment and family preferences are subject to numerical limitations, *see* 8 U.S.C. §§ 1152, 1153(a)–(b), and an immigrant visa must be "immediately available to [the alien] at the time his application is filed." 8 U.S.C. § 1255(a)(3). *See generally Babaria v. Blinken*, 87 F.4th 963, 972–74 (9th Cir. 2023). In addition, the applicant must meet other eligibility and admissibility requirements. *See* 8 U.S.C. § 1255(a)(2).

petitions but of all subsequent visa petitions, and . . . its mandatory provisions do not permit the exercise of any discretion.").

## B.

From its enactment in 1961 until 1986, the marriage fraud bar provided, in substance:

> [N]o petition shall be approved if the alien has previously been accorded [an immediate relative[4]] or preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws.

1965 Immigration (Hart-Celler) Act, Pub. L. No. 89-236, § 4, 79 Stat. 911, 915.

This wording proved inadequate in two ways. First, the provision said nothing about unsuccessful *attempts*—past or present—to gain status through sham marriages. *See Immigr. Marriage Fraud: Hearing Before the Subcomm. on Immigr. & Refugee Policy of the S. Comm. on the Judiciary*, 99th Cong. 20 (1985) [hereinafter *Immigration Marriage Fraud Hearing*] (statement of Alan C. Nelson, Comm'r, INS) ("Currently [8 U.S.C. § 1154(c)] only penalizes the

---

[4] Originally, "immediate relative" status was "nonquota status under [INA] section 101(a)(27)(A)." Act of Sept. 26, 1961, Pub. L. No. 87-301, § 10, 75 Stat. 650, 654 (formerly codified at 8 U.S.C. § 1155(c)); *see* Immigration Technical Corrections Act of 1988, Pub. L. No. 100-525, § 9(g), 102 Stat. 2609, 2620.

alien if he has already received a visa; there is no penalty at present . . . for trying."); *see also Amarante v. Rosenberg*, 326 F.2d 58, 60–61 (9th Cir. 1964) (holding that noncitizen had not "previously been 'accorded'" permanent residence—and the marriage fraud bar did not apply—because the agency revoked his classification petition for marriage fraud before he adjusted status).

The second inadequacy arose after 1970, when Congress created fiancé (or fiancée or "K-1") visas.  *See* Act of Apr. 7, 1970, Pub. L. No. 91-225, § 1(b), 84 Stat. 116, 116 (codified as amended at 8 U.S.C. § 1101(a)(15)(K)).  These visas filled a gap in existing law for noncitizens overseas who wanted to enter the United States to marry a U.S. citizen or permanent resident.  Because such persons "intend[ed] to remain permanently in the United States, they [could not] qualify as bona fide nonimmigrants and, until married, immigrant visas may not [have] be[en] available to them." Sesay, 25 I. & N. Dec. 431, 436 (B.I.A. 2011) (quoting H.R. Rep. No. 91-851, at 2 (1970)).  The 1970 legislation remedied this problem by creating a special category of nonimmigrant visa; if the marriage occurred within 90 days of entry, "the Attorney General was required to record the alien's lawful admission for permanent residence."  *Id.*

But the original version of § 1154(c) was "limited to aliens who have been accorded . . . an immigrant visa."  R.I. Ortega, 28 I. & N. Dec. 9, 14 (B.I.A. 2020).  Because a K-1 visa holder became "classifiable as an 'immediate relative'" only after he "entered the United States and married the United States citizen," Sesay, 25 I. & N. Dec. at 439 (quoting H.R. Rep. No. 91-851, at 8), the marriage fraud bar did not apply to someone whose sham K-1 visa application was denied—not just because § 1154(c)

did not cover attempts but because the provision did not cover nonimmigrant visas at all.

These two loopholes led to widespread immigration fraud, [5] and Congress became concerned. [6]   In 1986, Congress responded by expanding the scope of the marriage fraud bar to its present formulation:

> [N]o petition shall be approved if **(1)** the alien has previously been accorded**, or has sought to be accorded,** an immediate relative or preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence,   by   reason   of   a   marriage

---

[5] *See Immigration Marriage Fraud Hearing*, *supra*, at 6 (statement of Alan C. Nelson, Comm'r, INS) ("Marriage fraud and fianc[é] fraud now pose significant threats to the integrity of lawful immigration procedures."); *id.* at 26 (statement of Vernon D. Penner, Jr., Deputy Assistant Sec'y of State for Visa Servs.) (opining that "fraud involv[ing] the fianc[é] nonimmigrant visa category (K-l)" is "not dissimilar from the types of fraud which arise in immediate-relative and second preference cases").

[6] *See* 132 Cong. Rec. 6656 (1986) (statement of Sen. Paul Simon) ("There is a gaping hole in the current statute which has helped create a large number of active and highly lucrative 'mail-order bride' businesses."); *id.* at 33802–03 (statement of Sen. Alan K. Simpson) ("U.S. law grants immediate permanent resident alien status to any alien who marries a U.S. citizen.  For the many people who wish to enter our country by any means possible, the convenience and generosity of this immigration status has become a frequent target for fraud. . . . [L]egislative correction is needed . . . ."); *id.* at 27015 (statement of Rep. Romano L. Mazzoli) ("[A]lthough present law imposes civil and criminal penalties against those who commit immigration-related marriage fraud, clearly those measures have not proved equal to the task.").

determined by the Attorney General to have been entered into for the purpose of evading the immigration laws**, or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws**.

8 U.S.C. § 1154(c) (emphasis added); *see* Immigration Marriage Fraud Amendments of 1986, Pub. L. No. 99-639, § 4(a), 100 Stat. 3537, 3543.

## C.

Plainly, § 1154(c)(1) does not apply to Hanan. That subsection contains two requirements. First, there must be "a marriage" involving the noncitizen that was "entered into for the purpose of evading the immigration laws." 8 U.S.C. § 1154(c)(1). Second, the noncitizen must "[have] previously been accorded, or [have] sought to be accorded, an immediate relative or preference status . . . by reason of" that marriage. *Id.* Although the parties dispute the first element, the government does not contend that Hanan ever "sought to be accorded" an immediate relative classification based on his prior marriage.

The crux of the parties' dispute is whether § 1154(c)(2), like § 1154(c)(1), requires the noncitizen to seek an immigration benefit in connection with the fraudulent marriage. [7] Plaintiffs argue that it does, pointing to the

---

[7] The Immigration and Naturalization Service ("INS") promulgated a regulation providing that the agency will apply the marriage fraud bar where "there is substantial and probative evidence of . . . an attempt or conspiracy" to commit marriage fraud, "regardless of whether [the] alien *received* a benefit," 8 C.F.R. § 204.2(a)(1)(ii) (emphasis added), but the

statute's structure.  In their view, the two subsections were intended to be complementary.  The first subsection, which focuses on immigration benefits sought from marriages that already "have been entered into," 8 U.S.C. § 1154(c)(1), applies when there is or was a sham marriage.  The second subsection, which focuses on "attempt[s] or conspir[acies] to enter into" a sham marriage, *id.* § 1154(c)(2), would apply, as plaintiffs see it, only where there has been no marriage—namely, when a noncitizen seeks a fiancé visa.

There are several problems with plaintiffs' interpretation.  To begin with, nothing in subsection (c)(2)'s text limits its application to inchoate attempts or conspiracies to enter into a sham marriage.  Its use of the present perfect tense ("has attempted or conspired") suggests the opposite— that it applies to ongoing and completed schemes alike.  *See Padilla-Romero v. Holder*, 611 F.3d 1011, 1013 (9th Cir. 2010) ("As a purely grammatical matter, the use of the present perfect tense . . . can connote either an event occurring at an indefinite past time ('she has been to Rome') or continuing to the present ('she has been here for five hours')."); *see also United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes.").

The more fundamental textual problem with plaintiffs' reading of the statute is that it would impart two different meanings to the same statutory phrase.  Both subsections refer to "enter[ing] into" marriages "for the purpose of evading the immigration laws," but plaintiffs treat "for" differently in each.  In subsection (c)(1), "for" would mean "to facilitate."  The immigration laws are evaded not by the

---

regulation says nothing about whether the bar applies without a *request* for benefits.

sham marriage but by the approval of an I-130 petition based upon it.  In subsection (c)(2), however, plaintiffs treat "for" as meaning "to accomplish."  In their view, the purpose of evading the immigration laws is effected by the sham marriage itself; a noncitizen who enters the United States on a fiancé visa can apply for adjustment of status immediately after marrying.  *See* R.I. Ortega, 28 I. & N. Dec. at 12 ("K-1 visa holders have always been treated as the functional equivalents of immediate relatives for purposes of immigrant visa eligibility and availability.  There is no requirement for a Form I-130 immigrant visa petition to be filed for a K-1 visa holder because the adjustment of status application is predicated on the nonimmigrant Form I-129F visa petition itself." (citation omitted)).

Ordinarily, "we presume that words used more than once in the same statute have the same meaning throughout," *In re Cybernetic Servs., Inc.*, 252 F.3d 1039, 1051 (9th Cir. 2001), and eschew constructions that would accord a preposition "two different meanings at once," *Ramírez Muñoz v. Garland*, 71 F.4th 1174, 1177 (9th Cir. 2023) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 587 (2008)).  Nothing here counsels taking the opposite course. Congress knew how to condition the marriage fraud bar on an application for immigration benefits, having done so explicitly in § 1154(c)(1).  The inclusion of this condition in subsection (c)(1) indicates that its absence in subsection (c)(2) was deliberate.  *See City & County of San Francisco v. EPA*, 604 U.S. 334, 344 (2025) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (brackets omitted) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983))).

Plaintiffs argue that if we interpret § 1154(c)(2) so broadly as to include cases where no immigration benefits are sought, we make § 1154(c)(1) wholly redundant. Why, plaintiffs ask, would Congress have bothered to retain and expand subsection (c)(1) when concurrently adding a provision that subsumed it?

A fair point. The government posits that § 1154(c)(1) could apply to "one-sided" marriage fraud—when a noncitizen seeking immigration benefits hoodwinks an unsuspecting U.S. citizen into marriage—while § 1154(c)(2) could not. Congress was indeed aware that both one-sided and "contractual" marriage fraud were problems,[8] but subsection (c)(2) covers both scenarios. When the U.S. citizen intends to enter a bona fide marriage, there is no conspiracy between the marital parties, but the noncitizen still "has attempted" to commit marriage fraud; and when the U.S. citizen marries despite knowing of the scheme, the noncitizen "has . . . conspired" to commit marriage fraud.[9]  8 U.S.C. § 1154(c)(2).

---

[8] *Immigration Marriage Fraud Hearing*, *supra*, at 12–15 (statement of Alan C. Nelson, Comm'r, INS); *see* 132 Cong. Rec. 27015 (statement of Rep. Romano L. Mazzoli) ("In some cases, a U.S. citizen is party to the sham marriage. In many others, a U.S. citizen . . . has been cruelly duped . . . ."); 132 Cong. Rec. 27015–16 (statement of Rep. Daniel E. Lungren) (discussing these "two kinds of fraud"); 132 Cong. Rec. 27016 (statement of Rep. Hamilton Fish, Jr.) (same); 132 Cong. Rec. 6655 (statement of Sen. Paul Simon) (same).

[9] As government counsel acknowledged at argument, the only unique coverage provided by subsection (c)(1) in this regard is for one-sided marriage fraud committed by a U.S. citizen or permanent resident. If a U.S. citizen agrees to a noncitizen's bona fide marriage proposal with the secret intent of divorcing as soon as the noncitizen obtains immigration benefits, subsection (c)(1) would still apply

Even if § 1154(c)(1) provides no meaningfully unique coverage, however, that does not mean that it serves no purpose. Congress may have retained subsection (c)(1) as an easier means of proving marriage fraud. *See Campbell v. PricewaterhouseCoopers, LLP*, 642 F.3d 820, 828 (9th Cir. 2011) (explaining that legislators may intentionally enact a redundant provision if it is "much easier . . . to prove" than the provision that subsumes it (emphasis omitted)). Both subsections of § 1154(c) require a finding that one or both parties intended to enter into a marriage for a fraudulent purpose, but under subsection (c)(2), the element of attempt or conspiracy means, as a practical matter, that the government will need to show that the intent existed prior to any marriage. That may be difficult in some cases, particularly when the parties conspire. Under subsection (c)(1), the focus is on the filing for immigration benefits, which the government can easily show. The additional element of fraudulent intent may be more readily apparent from post-marriage evidence, such as the parties' failure to establish a shared residence or joint financial accounts, that takes on more significance given that the noncitizen has filed for immigration benefits.

Ultimately, we need not decide why Congress drafted the statute the way that it did, because the meaning of § 1154(c)(2) is unambiguous: if a noncitizen attempts or conspires "to enter into a marriage for the purpose of evading the immigration laws," then the marriage fraud bar applies, full stop. Whether the noncitizen takes any further actions,

---

notwithstanding the unfairness to the noncitizen who married in good faith. We agree with counsel that "it's unlikely" Congress retained subsection (c)(1) "with that specific circumstance in mind."

such as marrying and filing for immigration benefits, is immaterial.

Plaintiffs point to the legislative history, arguing that it "establish[es] that Congress intended that [§] 1154(c)(2) apply to those who sought immigration benefits, and that the amendment was targeted at beneficiaries of fiancé petitions who sought immigration benefits in the United States but never married." Even if plaintiffs' characterization of the legislative history were correct, we must "turn first to one, cardinal canon before all others"—we "presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). "When the words of a statute are unambiguous, then, this first canon is also the last: 'judicial inquiry is complete.'" *Id.* at 254 (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).

And it is far from certain that plaintiffs are correct about the legislative history. They rely heavily on a statement by Assistant Attorney General John R. Bolton setting forth the administration's position that the 1986 amendment to § 1154(c) would "[e]nsure that aliens who unsuccessfully sought immigration benefits through marriage fraud . . . never receive immediate relative or preference status." H.R. Rep. No. 99-906, at 11 (1986). Bolton's comments appear to concern only the change to § 1154(c)(1), i.e., the addition of "sought to be accorded." In any event, while he provided an example of conduct that would subject a noncitizen to the marriage fraud bar, he did not purport to provide a comprehensive definition. *See id.*

To the extent the administration's position is relevant, the BIA has consistently interpreted § 1154(c)(2) as

applying to conduct that falls short of seeking benefits.[10]  In an early case, the BIA opined that § 1154(c)(2) is triggered by nothing more than an *agreement* to marry in exchange for money.  *See* Kahy, 19 I. & N. Dec. 803, 807 n.3 (B.I.A. 1988).  More recently, however, the BIA has held that an agreement is "not enough" to show a conspiracy, and the parties must "engage in . . . other [overt] action or conduct that furthers that agreement."  R.I. Ortega, 28 I. & N. Dec. at 13.  While the filing of a visa petition is one such overt act, *see id.*, the BIA did not suggest that other acts—like the marriage itself or the payment of money—would not suffice.

Congress, for its part, stated that the purpose of the 1986 amendment was "to deter immigration related marriage fraud," and one way the bill accomplished this purpose was to bar "any alien who has *conspired to engage in* a fraudulent marriage"—not just those who "attempted to obtain an immigration benefit on the basis of such marriage[s]."  H.R. Rep. No. 99-906, at 6–7 (emphasis added).  One of the bill's sponsors expressed hope that the legislation would correct the problem of immigration marriage fraud "by discouraging fraudulent marriages."  132 Cong. Rec. 27016 (statement of Rep. Hamilton Fish, Jr.).  Thus, while we have no reason to rely on this legislative history, there is considerable evidence that Congress intended to bar noncitizens who merely entered into fraudulent marriages.

---

[10] "Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024).  BIA decisions are therefore "not controlling," but they nonetheless "constitute a body of experience and informed judgment to which [we] . . . may properly resort for guidance."  *Lopez v. Garland*, 116 F.4th 1032, 1039 (9th Cir. 2024) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

We hold, based on the statute's plain meaning, that
§ 1154(c)(2) does not require that the noncitizen apply for
an immigration benefit.

## III.

Plaintiffs alternatively contend that USCIS violated their
procedural due process rights by relying on Jaimes's
statement without making her available for cross-
examination.    "[T]o determine whether administrative
procedures provided to protect a liberty or property interest
are constitutionally sufficient," we balance the three factors
set forth in *Mathews*:

> First, the private interest that will be affected
> by the official action; second, the risk of an
> erroneous deprivation of such interest
> through the procedures used, and the
> probable value, if any, of additional or
> substitute procedural safeguards; and finally,
> the Government's interest, including the
> function involved and the fiscal and
> administrative burdens that the additional or
> substitute procedural requirement would
> entail.

*Kashem v. Barr*, 941 F.3d 358, 377–78 (9th Cir. 2019)
(quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).

Because "due process is flexible and calls for such
procedural protections as the particular situation demands,"
*Ching v. Mayorkas*, 725 F.3d 1149, 1157 (9th Cir. 2013)
(quoting *Mathews*, 424 U.S. at 334), we assess the *Mathews*
factors on a case-by-case basis, *id.* We take particular care
when assessing the process required in administrative

proceedings given the "inherent differences from the judicial process." *Id.*

In *Ching*, USCIS invoked the marriage fraud bar to deny an I-130 petition filed on behalf of a noncitizen, Teresita Ching. *See id.* at 1153. As evidence of the fraud, USCIS cited a six-sentence sworn statement from Ching's ex-husband that he and Ching had "never had sex," had "never lived together," and had married "not . . . for love" but for a payment of $14,000. *Id.* In response, Ching provided USCIS "a three-page, single-spaced, 21-paragraph sworn declaration . . . describing in excruciating detail her intimate relationship with [the ex-husband]." *Id.* USCIS rejected this evidence as "self serving," and the BIA affirmed the decision. *Id.* at 1153–54. Applying *Mathews*, we held that "under the specific circumstances" in that case, "due process required a hearing with an opportunity for Ching to confront the witnesses against her." *Id.* at 1159.

Plaintiffs contend that *Ching* compels a similar result here. We disagree.[11] The circumstances of this case are sufficiently different from *Ching* to warrant a different result.

## A.

Turning to the first *Mathews* factor, we begin by clarifying the exact liberty or property interest at issue. *Ching* held that a U.S. citizen who meets the I-130 criteria has a protected property interest in the petition's approval

---

[11] To the extent plaintiffs assert that we cannot uphold the BIA's rejection of their due process claim without first remanding for a more fulsome explanation of its decision, they are incorrect. Plaintiffs' due process claim does not constitute a "domain which Congress has exclusively entrusted to an administrative agency." *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943).

because § 1154(b)'s mandatory language makes the agency's decision nondiscretionary. *See Ching*, 725 F.3d at 1155–56; *see also* 8 U.S.C. § 1154(b) (stating that the Attorney General "shall" approve the petition if she determines the noncitizen is an immediate relative). That remains good law.[12]

In assessing "the degree of potential deprivation that may be created by [the] particular decision," *Mathews*, 424 U.S. at 341, *Ching*'s analysis is relevant. "[A] finding of past marriage fraud often means that the noncitizen spouse 'faces imminent removal from the United States, thus undoubtedly causing immense hardship'" to both the noncitizen himself and his wife. *Zerezghi*, 955 F.3d at 810 (quoting *Ching*, 725 F.3d at 1157). Thus, this factor supports additional procedural safeguards.

## B.

"The second *Mathews* factor we consider is the risk of an erroneous deprivation of [the] interest through the procedures used and the probative value of additional procedural safeguards." *Ching*, 725 F.3d at 1157. Here, both the procedures used and the probative value of additional procedural safeguards differ markedly from *Ching*.

Although "the risk of an erroneous finding that a prior marriage was fraudulent is high in cases where an ex-spouse is relied upon for evidence that the previous marriage was fraudulent," *Ching*, 725 F.3d at 1157–58, the risk was particularly acute in *Ching* because the ex-spouse's affidavit

---

[12] To the extent *Ching* also invoked liberty interests, *see* 725 F.3d at 1157, we need not decide whether it is clearly irreconcilable with *Department of State v. Muñoz*, 602 U.S. 899 (2024).

was the only adverse evidence, Ching provided "substantial evidence that the first marriage was bona fide," *id.* at 1158, and USCIS provided minimal process.  After confronting Ching with her ex-husband's "very terse statement in the notice of intent to deny," USCIS gave her one opportunity to respond before the agency denied the I-130 petition.  *Id.* at 1153.  And although Ching provided "extensive details" of her prior marriage, "photographs of the couple, joint utility bills, an apartment lease, and a letter [her ex-husband] had previously written to USCIS stating that he and Ching 'truly loved each other,'" the agency dismissed this evidence out of hand as "self serving."  *Id.* at 1153, 1158.  Due process generally requires that an agency give serious consideration to evidence that facially supports a claim.  *See Larita-Martinez v. INS*, 220 F.3d 1092, 1095 (9th Cir. 2000) (observing that that "the Due Process Clause requirement of 'a full and fair hearing'" requires administrative tribunals "to review all relevant evidence submitted" (quoting *Cuadras v. INS*, 910 F.2d 567, 573 (9th Cir. 1990))); *see also Dexter v. Colvin*, 731 F.3d 977, 981 (9th Cir. 2013) (holding that procedural due process required the agency to address the claimant's facially legitimate reason for filing a late social security appeal).

Here, the risk of an erroneous finding was significantly lower.  The ex-spouse's affidavit was only one factor among several that USCIS considered, and USCIS gave plaintiffs four opportunities to respond to the evidence used against them before issuing its decision—first at the USCIS office and then following each notice of intent to deny.  In the notices of intent to deny, USCIS addressed plaintiffs' evidence with reasoned explanations of why the agency found it unpersuasive.

Crucially, unlike in *Ching*, plaintiffs here provided no substantial evidence that Hanan's first marriage was bona fide.  Plaintiffs argue that Hanan's undisputed request for Jaimes to move to San Francisco "is not consistent with a marriage entered into solely for immigration purposes," but plaintiffs provided no evidence that Hanan and Jaimes lived together in Los Angeles or would have lived together in San Francisco.  Hanan's declarations conspicuously omit such representations.  Hanan referred to his residence in Tarzana as "my apartment," and while he asked Jaimes to "move to San Francisco" with him, it is unclear that he intended for her to live with him there.  Plaintiffs provided no evidence of joint tenancy or commingled financial resources.  *See Ching*, 725 F.3d at 1158 (noting Ching's "extensive" evidence of her and her former spouse's life together, including joint utility bills and an apartment lease).

On the other side of the ledger, the probative value of additional safeguards would be minimal.  Even if cross-examination of Jaimes undermined her credibility, the state investigative report in which Hanan admitted to paying Jaimes to marry him in exchange for immigration benefits provided independent evidence of marriage fraud.  Plaintiffs do not argue that the agency's reliance on the report violated due process.  In fact, plaintiffs used the report to cast doubt on Jaimes's statements, highlighting discrepancies between Hanan's statements to the investigators and Jaimes's statements to USCIS regarding the amount of the monthly payments.  Thus, plaintiffs have already had an opportunity to contest Jaimes's statements, and any additional opportunity would not affect most of the evidence supporting the marriage fraud bar.

Therefore, the second *Mathews* factor weighs decisively against additional safeguards.

## C.

The third *Mathews* factor assesses the government's interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Ching*, 725 F.3d at 1158.  As we acknowledged in *Ching*, "the government has a substantial interest in preventing marriage fraud and in avoiding erroneously providing benefits." *Id.*  While we found that the marginal cost to the government of holding an additional hearing was "minimal" there, *id.* at 1159, that was largely a function of the minimal process that the government had provided, *see id.* at 1153.  "At some point the benefit of an additional safeguard to the individual affected by the administrative action and to society in terms of increased assurance that the action is just, may be outweighed by the cost." *Mathews*, 424 U.S. at 348.

Given the nature of marriage fraud, USCIS will frequently rely on statements by a former spouse.  Requiring the agency to hold an evidentiary hearing in every such case, regardless of the circumstances, would impose substantial costs.  This case is illustrative.  Providing plaintiffs an additional opportunity to raise doubts about Jaimes's credibility when her statements are not essential to the agency's fraud finding would impose costs on the agency that are not offset by "increased assurance" that it would reach a just decision. *Id.*  Therefore, the third *Mathews* factor weighs against additional procedural safeguards.

\*     \*     \*

Weighing the three *Mathews* factors, we conclude that plaintiffs received adequate process.[13]  While their property interest in having USCIS reach a correct decision on Gillum's I-130 petition is substantial, requiring cross-examination of Jaimes would not materially advance that interest and would impose unnecessary burdens on the agency.

## IV.

Lastly, plaintiffs contend that substantial evidence does not support the agency's decision to apply the marriage fraud bar and that the district court therefore erred in granting the government summary judgment on plaintiffs' APA claim. To the contrary, overwhelming evidence supports the decision.

Jaimes signed a sworn statement that she made a "deal" with a third party to marry Hanan in exchange for payments. Independently, Hanan admitted to state investigators that a third party "found" Jaimes and that he paid her to marry him "in order to get a green card."  And plaintiffs' own evidence, even if viewed in isolation, offered very little support for their claim that Hanan and Jaimes had a bona fide marriage. As USCIS pointed out, Hanan provided no details about the marriage that would lend his story credibility.  The supporting affidavits from his father, uncle, and an acquaintance who "was not in really close contact with

---

[13] Because plaintiffs do not show a violation of their procedural due process rights, we need not decide whether plaintiffs must additionally show prejudice.  *See Ching*, 725 F.3d at 1156 ("The question of whether a plaintiff must demonstrate prejudice in the context of an I-130 [classification] petition is not settled.").

[Hanan]" were even more conclusory.  *Cf.* 8 C.F.R. § 204.2(a)(1)(iii)(B)(5) (providing that third party affidavits in support of a marriage being bona fide "must contain complete information and details explaining how the person acquired his or her knowledge of the marriage" and "should be supported, if possible, by one or more types of documentary evidence").  Other than evidence of the ceremony, Hanan provided no evidence of the usual hallmarks of a marriage, such as a shared residence and joint financial accounts.  *See* P. Singh, 27 I. & N. Dec. 598, 608 (B.I.A. 2019) (observing that "minimal documentary evidence of a shared life" can serve as circumstantial evidence that a marriage is not bona fide).

Plaintiffs argue that the state investigative report "lacks indicia of reliability" because names and other identifying information were redacted.  But the report discloses that it was based on an interview of Hanan by two California Department of Justice special agents from the Sacramento Regional Office of the Bureau of Gambling Control.  The interview occurred on Wednesday, July 6, 2011, from approximately 8:38 to 11:49 a.m. at a Starbucks located at 11861 San Pablo Avenue in El Cerrito.  At the beginning of the interview, the agent who authored the report identified himself to Hanan with his state-issued credentials.  Hanan was advised that he had no obligation to speak with the agents and was free to leave whenever he wanted.

Plaintiffs do not dispute any of this, and it was their burden to establish that the report was unreliable.  *See Espinoza v. INS*, 45 F.3d 308, 310 (9th Cir. 1995) ("The burden of establishing a basis for exclusion of evidence from a government record falls on the opponent of the evidence, who must come forward with enough negative factors to persuade the court not to admit it.").  We assume "that public

officials perform their duties properly without motive or interest other than to submit accurate and fair reports." *Id.* (quoting *Keith v. Volpe*, 858 F.2d 467, 481 (9th Cir. 1988)). Hanan did not deny making the statements attributed to him in the report, and plaintiffs do not explain how the redactions make it unreliable given that Hanan was the source of most of the redacted information.

Nor do minor factual discrepancies between what Hanan told the investigators and Jaimes told USCIS make the report unreliable. That Hanan and Jaimes had different recollections about the amount of Hanan's monthly payments could reflect fading memories or an attempt by Hanan to minimize his conduct, but neither possibility undermines the accuracy of the report. Hanan's statement to the investigators that an immigration attorney named George "helped him with his paperwork" is not even a discrepancy—in a declaration to USCIS, Hanan admitted that he "consult[ed] with an immigration attorney" notwithstanding that he and Jaimes "never filed anything with immigration."

Lastly, plaintiffs maintain that the BIA failed to address evidence that they submitted to rebut USCIS's marriage fraud finding and, more generally, to apply the agency's burden-shifting framework. The BIA concluded that there was substantial and probative evidence that Hanan and Jaimes were in a sham marriage and that Gillum "submitted insufficient evidence" to rebut that finding and "establish that [Hanan's] first marriage was bona fide." That is the usual framework. *See Zerezghi*, 955 F.3d at 813 (citing Kahy, 19 I. & N. Dec. at 806–07).

The BIA "need not discuss each piece of evidence submitted" in its decision. *Gonzalez-Caraveo v. Sessions*,

882 F.3d 885, 894 (9th Cir. 2018).  Here, the director of the USCIS San Francisco Field Office acknowledged and described in great detail the photographs and affidavits that Gillum submitted in rebuttal.  He accorded "little weight" to the affidavits because "none of the affiants mention any detailed, ongoing interaction with [Jaimes and Hanan] in the course of their married life."  He found that the photographs showed only that Jaimes "interacted with [Hanan] on various occasions."  The BIA also concluded that Gillum's rebuttal evidence was insufficient and highlighted the lack of "evidence of joint residency, joint ownership of property, or commingling of finances."  Nothing more was required.

**AFFIRMED.**